UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CHRISTELLE MAZILE,
    Plaintiff,
v.
                                CASE NO.:

LARKIN UNIVERSITY,
CORP., Florida Non-Profit
Corporation, and EXAMSOFT
WORLDWIDE, INC., a
Texas For-Profit Corporation,
    Defendants.
_____/

COMPLAINT FOR DAMAGES

**COMES NOW**, the Plaintiff, Christelle Mazile ("Ms. Mazile" or "Plaintiff") by and through the undersigned counsel, and complaining of the Defendants, Lakin University Corp., ("University") and ExamSoft Worldwide, Inc. ("ExamSoft Worldwide") states as follows:

PARTIES

1. Plaintiff is a natural person, is over the age of eighteen (18) years old, is of sound mind and competency, and is otherwise *sui juris*.

2. University is a Florida non-profit corporation, with a principal address located at Larkin University 18301 N. Miami Ave., Miami, Florida 33169.

3. ExamSoft Worldwide is a for-profit Texas corporation, with a registered office at 211 E. 7th St., Suite 620, Austin, TX 78701.

4. Plaintiff attended University between August of 2017, and May of 2020, prior her expulsion, which resulted after she was wrongfully accused of cheating on a final examination due to known errors in the ExamSoft Worldwide test monitoring software "ExamMonitor" (the "EM Software").

1

## JURISDICTION

5. A substantial part of the acts and omissions giving rise to this litigation occurred in Miami, Florida and the Southern District of Florida is the appropriate venue for Plaintiff's claims, accordingly. *See* 28 U.S.C. § 1391 (2023).

6. Defendant, University is a Florida non-profit corporation, which is duly registered with the Department of State, and has agreed by such filing to submit to the personal jurisdiction of the courts of the state of Florida.

7. ExamSoft maintains minimum contacts with the state of Florida, such that suit in this state does not offend any notions of fair play and substantial justice. More specifically, ExamSoft advertises its products to universities and other school type institutions in the state of Florida; enters into contracts, agreements, or licensing with said Florida institutions; and permits its products to be utilized by Florida based entities, including University.

8. Furthermore, Plaintiff's claims arise directly out of ExamSoft's activities in the state of Florida, i.e., licensing the EM Software to University, the use of which caused Plaintiff to be expelled.

9. Ultimately, because ExamSoft advertises itself as a national based company, open for business in all forums (including Florida), intentionally licensed its software to Florida companies, and caused Plaintiff's injury in Florida, the exercise of jurisdiction over ExamSoft comports with traditional notions of fair play, substantial justice, and does not violate due process.

10. Subject-matter jurisdiction is vested in the United States District Court under 28 U.S.C. § 1331.

## GENERAL ALLEGATIONS

11. Ms. Mazile, an African American female with diagnosed anxiety and ADHD, was a student at the University, enrolled in the Doctorate Pharmaceutical program, with an expected graduation date of May 2021.

12. Mr. Mazile paid the University over $135,000.00, as of the date of her expulsion, in order to attend and in pursuit of her degree.

13. Mr. Mazile was scheduled to take final examinations in Infections Disease 1, 2, and 4 on in the spring of 2020.

14. Such exams were scheduled during height of the Covid-19 pandemic which sent shockwaves through our nation beginning in March of 2020.

15. Given the pandemic, the University had arranged for final examinations to be taken remotely and upon information and belief contracted (expressly or impliedly) with ExamSoft for use of remote testing software, including the EM Software.

16. The initial examinations, completed by Ms. Mazile, were administered *without* the EM Software and were accordingly not remotely proctored or monitored.

17. These examinations were completed on an "honor system" in the residence or desired location of each student attending the University.

18. Ms. Mazile upheld the honor code, did not utilize unpermitted testing aids, and ultimately did not achieve an eighty percent (80%) or better on her examinations.

19. Ironically, had Ms. Mazile intended to cheat, she could have easily done so during the unmonitored initial examinations.

20. Nevertheless, due to her failure to achieve the threshold score above eighty percent (80%), Ms. Mazile was required to take a remediation examination.

21. The remediation exams took place on May 4, 2020, and May 6, 2020, and May 8, 2020, respectively.

22. The completion of these examinations required the use of ExamSoft, EM Software.

23. Ms. Mazile was not given an option regarding the use of the EM Software and had no direct negotiating power or authority with ExamSoft.

24. Rather, Ms. Mazile was to utilize the EM Software, or be failed for her courses; an obviously unreasonable and almost illusory "choice".

25. The ExamSoft EM Software allegedly works by creating "a continuous audio and video recording of the exam-taker using both webcam and screen capture." After an exam is completed, the footage is uploaded to ExamSoft for "review" by an artificial intelligence ("AI") system. Said system apparently "identifies any abnormalities in the student behavior based on movement, gaze, or background noise." The EM Software then "flags" what it deems to be an "incident" of irregular behavior.

26. The EM Software has drawn criticism, as early as December of 2020, when Congresspersons Richard Blumentahl, Ron Wyden, Chris Van Hollen, Tina Smith, Elizabeth Warren, and Cory A. Booker composed an open letter to ExamSoft (the "Letter") seeking answers to "recent media reports and personal stories, students – particularly students of color and with disabilities – have faced alarming issues in using software, been locked out of tests, or wrongfully accused of cheating." [Exhibit A].

27. The Letter also expresses concerns that the "[EM Software] has not been designed to be inclusive and mindful of all students' needs. [Exhibit A].

28. Numerous other articles, stories, or publications have been made which evidence a clear pattern of the EM Software, and its undoubted discriminatory effect on African America students, and those with disabilities.

29. ExamSoft received and responded to the Letter, and was undoubtedly on notice of the issues, errors, and problematic discriminatory effect of the EM Software in December of 2020, approximately five (5) months before Ms. Mazile was forced to take her remediation examinations utilizing the same software.

30. After the May 4, 2020, examination, Ms. Mazile was "flagged" by the EM Software for cheating.

31. Ms. Mazile was ultimately expelled from the University based on the EM Software incident report, which flagged her behavior as "cheating".

32. The University refused to allow Ms. Mazile to retest, in person or otherwise, and refused to consider or investigate her claims that the EM Software had a discriminatory effect based on her race, as well as her ADHD and anxiety.

<u>COUNT I: 42 U.S.C. § 1983 [Fourteenth Amendment]</u>
Ms. Mazile v. University

33. Ms. Mazile reasserts and incorporates by reference paragraphs '10' through '32' as if specifically set forth herein.

34. The University is a private actor, which was acting under color of state law by virtue of the fact that it was, and does, perform a primarily and traditionally state function.

35. More specifically, education is a traditional function of the State, and the University's sole purpose is to educate the students who attend the University.

36. Because the University performs a public function, it should be considered an arm of the state for purposes of 42 U.S.C. § 1983.

37. Furthermore, and alternatively, there is joint action or a nexus between the State and the University, which meets the joint action test for state action. More specifically, the University (while private) upon information and belief accepts federal funds including grants, federally backed student loans, and research. Because the University accepts and uses the benefit of federal funding, it can be said to be in joint action with the State.

38. The University violated Plaintiff's rights under the Fourteenth Amendment, because it intentionally chose to utilize the EM Software with actual or constructive knowledge that would have a discriminatory effect, based on Plaintiff's race.

39. As noted above, at least in December of 2020, months prior to Plaintiff's use of the EM Software, the Letter was sent to ExamSoft, and numerous individuals had made *public* claims regarding the disparate treatment of the EM Software as to African American users.

40. With that knowledge, the University contracted with ExamSoft to utilize this discriminatory software, and in fact required Plaintiff to utilize it for her remediation examinations.

41. Students of other races, who were similarly situated to Plaintiff, who utilized the EM Software were treated differently, in that their immutable characteristics did not erroneously trigger "flags" for cheating, which resulted in their expulsion from the University.

42. University's intent to discriminate can be inferred from the fact that they had direct or circumstantial knowledge of the discriminatory effect of the EM Software, and nevertheless required Plaintiff, an African American student to utilize the same.

43. Furthermore, the University's intent to discriminate against Plaintiff based on race is clear from their post-examination refusal to consider plain evidence that the EM Software discriminates against minorities.

44. The discriminatory actions of the University directly caused Plaintiff to be expelled from the University, which resulted in monetary harm.

45. More specifically, Plaintiff has over one hundred thousand dollars of debt, which was paid to the University toward her education; no degree and accordingly no pharmaceutical career.

**WHEREFORE** Plaintiff demands judgment and all damages available under federal law, including monetary damages, injunctive relief, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

<u>COUNT II: ADA (Discrimination)</u>
(Ms. Mazile v. University)

46. Plaintiff reasserts and incorporates by reference paragraphs '10' through '32' as if fully set forth herein.

47. Plaintiff has a disability as defined by the Americans with Disability Act ("ADA"), more specifically, Attention Deficit Hyperactivity Disorder ("ADHD") and anxiety.

48. University is a place of "public accommodation" as defined by the ADA because it is a place of public gathering.

49. More specifically, students are instructed to physically attend the campus in order to gather and learn.

50. University was aware that Plaintiff had ADHD and/or anxiety at the time that she was taking her renumeration examine in May of 2020.

51. University discriminated against Plaintiff because of her ADHD and anxiety.

52. More specifically, University had actual or constructive knowledge that the EM Software had a discriminatory effect on individuals who had certain learning disabilities.

53. This knowledge was gleaned from a highly publicized open letter from congress, as well as numerous other stories and investigations posted publicly online and in social media.

54. With this knowledge, University nevertheless utilized the EM Software, and required that Plaintiff take her examine with the remote monitoring aspects of the EM Software activated.

55. Plaintiff was injured as a direct and proximate result of the discrimination because the EM Software erroneously indicated that she had been "flagged" for cheating on her renumeration examinations, and she was expelled.

**WHEREFORE**, Plaintiff demands judgment and any damages available under federal law, including monetary damages, injunctive relief, and attorney's fees pursuant to 42 U.S.C. § 12205.

<u>COUNT III: ADA (Failure to Accommodate)</u>
(Ms. Mazile v. University)

56. Plaintiff reasserts and incorporates by reference paragraphs '10' through '32', and '47' and '48' as if fully set forth herein.

57. Plaintiff is, apart from her disabilities, able to complete all necessary functions of attending the University.

58. The University had actual or constructive knowledge of Plaintiff's disability.

59. With such knowledge, the University refused to provide reasonable accommodation to Plaintiff, with respect to her renumeration examination.

60. In that respect, the University had direct or circumstantial knowledge that the EM Software might unreliably "flag" Plaintiff for cheating because of her learning related disabilities.

61. Nevertheless, the University did not provide Plaintiff with any alternative whatsoever to complete her renumeration examination such as an in-person examination, or different exam software, or any other viable option.

62. The provision of reasonable accommodation would not have required the University to "lower its standards" or "substantially modify" its processes.

63. Instead, Plaintiff merely required either (a) more time to "practice" and become familiar with the EM Software and EM Software process; and/or (b) an in-person examination experience; and/or (c) a virtual examination with a live proctor, such as via zoom or any other virtual communication software, which would have permitted Plaintiff to be seen in real time, by a *person* rather than AI.

64. Plaintiff was proximately damaged by the failure to provide reasonable accommodation.

    **WHEREFORE** Plaintiff demands judgment and all damages available under federal law including monetary damages, injunctive relief, and attorney's fees pursuant to 42 U.S.C. § 12205.

COUNT IV: INTENTIONAL MISREPRESENTATION
(Ms. Mazile v. ExamSoft)

65. Plaintiff reasserts and incorporates by reference paragraphs '10' through '32' as if fully set forth herein.

66. In or about December of 2020, ExamSoft issued a response to the Letter (the "Response"), wherein it makes numerous representations regarding the efficacy of its EM Software and the non-discriminatory nature of its technology. [Exhibit B].

67. The Response is publicly available and is posted on the ExamSoft web platform for viewing by users and the general public.

68. In the Response, ExamSoft expressly represents that it has "investigated whether there have been any systematic issues with [the remote monitoring software] due to individuals' exam-takers' race or gender identification. It would be a key priority to resolve any such issues, btu we have found none." [Exhibit B].

69. In the Response, ExamSoft expressly represents that "[it] is committed to ensuring that [remote monitoring software] is accurate for all exam-takers, regardless of their physical appearance or dress." [Exhibit B].

70. Furthermore, on its website, ExamSoft represents that it is a "technology-drive remote proctoring solution that digitally observes exam-takers" in order to ensure academic honesty. However, the website makes no mention whatsoever that the software may have discriminatory effects on minority races and individuals with disabilities.

71. These representations, or omissions are material and are undoubtedly made for the purpose of inducing users, including Plaintiff, to utilize the software.

72. ExamSoft has willfully published these representations with knowledge that they are false.

73. ExamSoft has made these false representations with the intent and purpose that others purchase their license and utilize the EM Software.

74. Plaintiff acted in reliance on these, and other representations made by ExamSoft as to the efficacy of its EM Software, or nondiscriminatory impact thereof, in using the EM Software to take her remediation examinations.

75. Plaintiff was materially damaged as a direct and proximate result because the EM Software wrongfully "flagged" her for cheating based on her disability and/or race and she was expelled from the University.

76. The actions of ExamSoft in intentionally misrepresenting the equal treatment resulting from use of EM Software, in the face of clear and unequivocal evidence, and numerous public complaints (including those from United States Senators) to the contrary evidence a malicious intent, and bad faith which justifies imposition of punitive damages.

**WHEREFORE** Plaintiff demands judgment and damages available under state and federal law, including monetary damages, and punitive damages (*see Rua v. Cuppa, Inc.*, 2017 U.S. Dist. LEXIS 7447 (M.D. Fla. Jan. 19, 2017).

<u>COUNT V: NEGLIGENT MISREPRESENTATION (PLED ALTERNATIVELY)</u>
(Ms. Mazile v. ExamSoft)

77. Plaintiff reasserts and incorporates by reference paragraphs '1' through '32', and '67' through '71' and '92' through '94' as if fully set forth herein.

78. ExamSoft uttered or published the statements set forth in paragraphs '67' through '71' as incorporated herein, believing them to be true, but which are in fact false.

79. ExamSoft was at the least negligent in making the representations, because under the circumstances including the Letter, numerous public and published complaints, and on information and belief numerous directly received complaints, it should have known its statements were false.

80. Plaintiff was induced to rely and did in fact rely on these statements in submitted to the examinations using the EM Software, peddled by ExamSoft.

81. Plaintiff was injured as a direct and proximate result, as she was in fact discriminated upon based on race and/or disability when using the EM Software, which "flagged" her for cheating, and she was expelled.

82. The actions of ExamSoft in negligently misrepresenting the equal treatment resulting from use of EM Software, in the face of clear and unequivocal evidence, and numerous public

complaints (including those from United States Senators), and on information and belief internal comments, to the contrary evidence a malicious intent, and bad faith which justifies imposition of punitive damages.

**WHEREFORE** Plaintiff demands judgment and damages available under state and federal law, including monetary damages, and punitive damages (see *Rua v. Cuppa, Inc.*, 2017 U.S. Dist. LEXIS 7447 (M.D. Fla. Jan. 19, 2017).

<u>COUNT VI: BREACH OF WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE</u>
(Ms. Mazile v. ExamSoft)

83. Plaintiff reasserts and incorporates by reference paragraphs '1' through '32' as if fully set forth herein.

84. Plaintiff and ExamSoft were in privity of contract, by virtue of an "End User Licensing Agreement for ExamSoft Worldwide, Inc." ("End User Agreement"), attached as Exhibit C, or a similar agreement the precise version of which, is upon information and belief, in the possession and control of ExamSoft.

85. At the time that this End User Agreement was made, ExamSoft knew or had reason to know of the particular purpose for which Ms. Mazile was using the EM Software.

86. More specifically, it was aware that Ms. Mazile and other students utilizing the EM Software did so to engage in testing from a public or private learning institution.

87. In entering the End User Agreement and utilizing the Software, Ms. Mazile relied on the skill and judgment of ExamSoft to satisfactorily provide the EM Software to be fit for the above stated purposes.

88. The EM Software, however, was not fit for the purpose of remote examination completion.

89. More specifically the EM Software improperly discriminated against Ms. Mazile based on her race and/or disability, and "flagged" behavior as indicative of cheating, which was not, in fact, cheating.

90. Ms. Mazile was injured as a result of the EM Software's unfitness, in that her University expelled her based on the EM Software's findings.

91. To the extent that the End User Agreement contains a "disclaimer" of warranties, the End User Agreement is a classic contract of adhesion, wherein Plaintiff had no opportunity for negotiation whatsoever, lacked legal representation, and was required to submit to the terms propounded by a large corporate entity or be refused access to the testing software.

92. In that regard, any 'waiver' of warranties contained in the End User Agreement is unenforceable, void as against public policy, and/or unconscionable and does not in any way bar Ms. Mazile from her breach of warranty claims, or insulate ExamSoft from liability.

93. Similarly, any purported 'limitation of liability' contained in the End User Agreement suffers from the same deficiencies set forth above.

**WHEREFORE**, Ms. Mazile demands judgment and all damages available under state and federal law.

### JURY DEMAND

Plaintiff demands a trial by jury as to all issues set forth herein, which are triable by right by a jury. *See* Fed. R. Civ. P. 38(b).

Submitted this 29th day of August, 2023.

Respectfully Submitted,

By: *Diego Mendez*
Diego G. Mendez, Esquire
Florida Bar # 52748

MENDEZ LAW OFFICES, PLLC
PO Box 228630
Doral, Florida 33222-8630
Tel: (305) 264-9090
Fax: (305) 809-8475
E: diego.mendez@mendezlawoffices.com
*Attorney for Plaintiff, Christelle Mazile*